UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PIYUSH JAIN,<br><br>        Plaintiff,<br><br>  v.<br><br>NANCY A. BERRYHILL,<br><br>        Defendant. | Case No. 16-cv-04603-JCS<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REMANDING FOR PARTIAL AWARD OF BENEFITS AND FURTHER PROCEEDINGS**<br><br>Re: Dkt. Nos. 15, 20 |

## I.    INTRODUCTION

Plaintiff Piyush Jain, proceeding pro se, seeks review pursuant to 42 U.S.C. § 405(g) of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his application for disability insurance benefits under Titles II and XVIII of the Social Security Act.  Presently before the Court are the parties' cross-motions for summary judgment. Jain asks the Court to reverse the Commissioner's denial of his application for benefits and award disability benefits or, in the alternative, remand for further proceedings.   The Commissioner asks the Court to affirm its decision denying benefits to Jain.  For the reasons stated below, the Court GRANTS Jain's Motion for Summary Judgment and DENIES the Commissioner's Motion for Summary Judgment.  The Court reverses the decision of the Commissioner and remands this case for award of benefits for the period May 1, 2014 through November 25, 2015.  The Court remands for further proceedings to determine whether Jain continued to be disabled after November 25, 2015.[1]

---

[1] All parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

## II.    BACKGROUND

### A.    Procedural Background

On December 9, 2014, Jain applied for disability insurance benefits pursuant to Title II and Title XVIII of the Social Security Act. Administrative Record ("AR") at 119-120.  In his Disability Report, Form SSA-3368,[2] he listed the following medical conditions as the basis for his disability claim:  1) Achalasia; 2) Esophagitis; 3) Disorder of Function of Stomach;  4) Insomnia; 5) Atopic Dermatitis; and 6) Inflammatory Disease of Liver.  *Id.* at 211.  He stated that he stopped work altogether because of his disability on July 1, 2014, and that his condition caused him to "make changes in [his] work activity" starting on May 1, 2014.  *Id.*[3]  After Jain's claim was denied initially and upon reconsideration, he requested a hearing before an Administrative Law Judge ("ALJ").  *Id.* at 92, 97, 102.   A hearing was conducted by ALJ John J. Flanagan on February 10, 2016.  *Id.* at 32.  The ALJ took testimony from Jain and a Vocational Expert ("VE"), Linda Tolley.  *Id.*  On February 26, 2016, the ALJ issued a written decision finding that Jain was not disabled.  *Id.* at 18-26.   The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  *Id.* at 4-7.

### B.    Personal History

Jain was born on April 5, 1973.  *Id.* at 207.  In 1994, he received his undergraduate degree in accounting; he received an MBA with a concentration in Business Analysis, Marketing and Information Systems in 1997.  *Id.* at 43, 219.  He also holds "diplomas in Ecommerce (web technology) Program and Oracle Specialist Program."  *Id.*   Jain worked as a project manager for Infobizz, Inc. ("Infobizz") from June 2002 to December 2010.  *Id.* at 47-48, 212.  According to Jain, he was able to continue working at Infobizz until 2010 because his employer accommodated him, allowing him to work remotely and to keep a bucket under his desk for vomiting during his

---

[2] Although the form itself is undated, the Table of Contents to the Administrative Records states that Jain completed this form on December 10, 2014.
[3] The Application Summary states that Jain's alleged onset date is July 1, 2014.  AR at 119. However, the Social Security Administration (including the ALJ) treated May 1, 2014 as Jain's alleged onset date.  *See, e.g.,* AR at 18, 73, 82. 114, 151, 155, 188. There is no explanation of this discrepancy in the record but the Court presumes it is based on Jain's response on the Disability Report stating that he had to make changes in his work activities as of May 1, 2014.

1  occasional office visits.  *Id.* at 301.  After he lost his job at Infobizz, however, he says that he was

2  unable to find an employer who would hire him because of his achalasia.  *Id.*  He had no earnings

3  in 2011 and 2012, *id.* at 180-181, but the record reflects that he received a certification in

4  Advanced Project Management from Stanford University in March 2012.  *Id.* at 212.  Jain worked

5  as a consultant for Mindpower Group, Inc. ("Mindpower"), a company that he created, from

6  January 2013 through June 2014.  *Id.* at 49, 212.  He testified at the hearing that in April and May

7  of 2014 he "hardly made $1000," though he had made approximately $2,300/month after taxes in

8  the months before that.  *Id.* at 50.  He further testified that he was unable to continue with his

9  business after May 2014 because he was "struggling with [his] health situation" and lost his

10  project.  *Id.* at 49-50.

11  ### C.  Summary of Relevant Medical History

12  Jain has a history of esophageal achalasia[4] and associated problems, dating back to 2002.[5]

13  *Id.* at 435.  In 2006 he had severe vomiting and in 2007 he lost a "great deal of weight."  *Id.*  He

14  had various tests performed at Kaiser Hospital, which revealed he had a "dilated esophagus."  *Id.*

15  In 2007, Jain underwent a laparoscopic Heller myotomy.  *Id.*  Although he gained back

16  approximately 50 pounds after this procedure, he continued to have trouble eating, feeling that his

17  food was sticking.  *Id.*  He continued to vomit after eating and had to stand at all times while

18  eating, "even if he [went] to a restaurant."  *Id.*

19  Because of his condition, Jain adjusts his eating time and can only eat small amounts of

20  food.  *Id.* at 435-436.  According to Jain, he is constantly hungry and has to get up in the nighttime

21  to eat even though this causes him to vomit.  *Id.* at 436.  He also has difficulty drinking fluids and

22  has burning pain.  *Id.*

23  Jain's medical records reflect that on May 3, 2013, he sought treatment at the Newark

24  Wellness Center for hepatitis and "moderate" heartburn.  *Id.* at 338.  He received treatment from

25  _____

26  [4] Esophageal achalasia is defined as "[f]ailure of normal relaxation of the lower esophageal
    sphincter associated with uncoordinated contractions of the thoracic esophagus, resulting in
27  functional obstruction and difficulty swallowing."  Stedmans Medical Dictionary 5910.
    [5] The Administrative Record contains no medical records prior to May 2013.  The history prior to
28  that date is based on "limited records" and information Jain provided to consultative examiner Dr.
    Eugene McMillan.  AR at 435.

Dr. Meera Bhateja. *Id*. at 345. The report from that visit states that the onset of heartburn was four years ago and the severity was "moderate." *Id.* at 338. The report described the following symptoms associated with Jain's heartburn: "dysphagia, hoarseness, reflux and vomiting." *Id*. He was negative for "fever, lethargy, weight gain and weight loss." *Id*. at 339. The report listed esophagitis as a "chronic problem" but stated that the status of Jain's esophagitis was "improved." *Id.* at 338. The report listed his height at 5 feet, 11 inches and his weight at 175 pounds. *Id.* at 346. Jain continued to receive treatment for esophagitis, heartburn and gastroesophageal reflux disease ("GERD"), among other things, at the Newark Wellness Center, with return visits on 9/3/13, 12/11/2013, 2/4/2014, 3/11/2014, 11/18/2014, 7/28/15 and 1/6/16.[6] *Id*. at 350-401, 432-434, 459, 480-484. His weight was recorded at 179 lbs. (9/3/13), 178 lbs. (12/11/2013), 175 lbs (2/4/2014), 174.6 (3/11/2014), 175.8 (11/18/2014), 179 (7/28/15) and 167.8 (1/6/15). *Id.*

Dr. Bhateja prescribed esomeprazole magnesium ("Nexium") for Jain's esophagitis. *Id*. at 336, 350, 367, 385, 397, 433. A notation in the visit notes for September 3, 2013 states that Jain "has discontinued meds for now due to religious reasons," *id*. at 352, but is not clear how long Jain was not taking his medications, which Dr. Bhateja continued to prescribe at all subsequent visits until 2016. Dr. Bhateja ordered numerous tests and procedures, including a CT Thorax with and without dye, an EGD (upper GI endoscopy) and a CT Abdomen w/contrast. *Id*. at 350, 376, 355, 439. The EGD was completed at the Alameda County Medical Center on December 27, 2013. *Id*. at 412-415. That procedure confirmed Jain's diagnosis of achalasia. *Id*. at 412. Dr. Bhateja also referred Jain to a GI clinic at the Alameda County Medical Center, where he was seen by Dr. Maximillian Lee on October 11, 2013. *Id*. at 355, 372, 423-424.

Dr. Lee stated in the "History of Present Illness" section of his report that Jain has a "past history of achalasia, status post Heller myotomy in 2007" and that Jain had an EGD in 2011 "which showed chronic active gastritis, and biopsies were positive for H pylory." *Id*. at 423.

---

[6] It appears the records from the Newark Wellness Center may not be complete. At Jain's 11/18/14 appointment, the report states that his next appointment was scheduled for December 31, 2014 but there is no record of that visit. *Id*. at 434. Similarly, the report for Jain's CT Abdomen w/contrast, performed on May 12. 2015, states that Jain was referred for this procedure by Dr. Bhateja, suggesting Jain may have been seen by Dr. Bhateja between December 31, 2014 and July 28, 2015.

According to Dr. Lee, the 2011 EGD revealed that the "visual appearance of GE junction showed a fairly appropriate competency of the sphincter at that time." *Id*. On the day of the appointment with Dr. Lee, Jain complained of dysphagia and "retrosternal burning sharp pain that radiates to his back." *Id*. Jain reported that initially the pain responded to water and Nexium, "but now, only improved with eating banana." *Id*. Dr. Lee referred Jain for an aphasia manometry (also referred to as a motility study) and esophageal impedance-pH study." *Id*.

The esophageal manometry and impedance studies were performed at California Pacific Medical Center on November 26, 2013. *Id*.at 310-335. The impedance study was performed by Dr. William Snape, whose impression was that Jain "appears to have had significant nonacid reflux that should be treated with Carafate suspension." *Id*. at 311. The motility study revealed an incompetent lower esophageal sphincter ("LES") and "[a]chalasia type 2 by the Chicago classification with pan esophageal pressure changes." *Id*. at 314; *see also id.* at 411 ("Esophageal motility study showed normal relaxation at the EG juncture [but] [o]n the esophageal body, all swallows had failed peristalsis leading to impression of achalasia type 2 . . . with pan-esophageal pressure changes and incompetent lower esophageal sphincter with low or little or no relaxation").

Jain returned to the GI clinic at the Alameda County Medical Center on June 20, 2014, where he was seen by Dr. Taft Bhuket. *Id*. at 410-411. According to the "History of Present Illness" section of the report, Jain was prescribed sucralfate after his manometry and it "helped him out" so he stopped taking Nexium. *Id*. at 410. At the time of the June 20, 2014 visit, Jain was taking 1 gram of sucralfate 4 times a day. *Id*. Jain reported that he still had episodes of reflux, however, and "a lot of trouble eating." *Id*. He reported that it took him "approximately 5 hours out of his day to eat and that while eating he needs to stand up." *Id*. He also reported that he had to sleep with two pillows to decrease his reflux. *Id*. Dr. Bhuket wrote that Jain "now has absent peristalsis throughout his entire esophagus and non-acid reflux." *Id*. He continued, "[c]urrently, there are no curative treatments for this patient's achalasia, so we recommended symptomatic treatments including significant lifestyle changes including eating a pureed diet mixed with liquids." *Id*. Jain was also put back on Nexium, with the recommendation that Jain take the Nexium prior to eating and the sucralfate after eating in order to increase the effectiveness of the

Nexium. *Id.* The report stated that Jain would return for a follow-up in 3 months. *Id.*[7]

On February 3, 2015, a consultative internal medicine evaluation was completed by Dr. Eugene McMillan. *Id.* at 435. Dr. McMillan summarized the history of Jain's illness based on "limited records." *Id.* He noted that Jain had eaten at 7 am and that he was "still vomiting when his exam began at 9 am." *Id.* Jain told Dr. McMillan that he was taking both Nexium (up to five tablets a day) and Carafate (sucralfate). *Id.* at 436. He also reported that he only eats small amounts of food, has difficulty drinking fluids and has burning pain. *Id.* Dr. McMillan summarized the tests performed on 11/26/13 and 6/20/14, discussed above. *Id.* at 437. He also noted that Jain had a liver ultrasound done on September 28, 2013, "which revealed increase in liver echogenicity compatible with fatty infiltration or progression of chronic hepatocellular disease." *Id.* He recorded Jain's weight at 175 pounds. *Id.* He concluded with the following Functional Capacity Assessment:

> The claimant has severe limitations related to his severe vomiting and his restrictions on eating. He would be able to occasionally lift 50 pounds and frequently lift 25 pounds. Standing and walking would be for at least six hours during an eight-hour workday. Sitting would be for six hours. The claimant is limited because he generally eats only once during the day because he immediately has vomiting after eating and generally vomiting is occurring after the eating and disruption of his sleep cycle. He is not currently using any assistive device. He would be able to engage in activities that required stooping, kneeling or crouching for up to a third of a workday. There would be no limitations with seeing, hearing or speaking. There would be no limitations with gross or fine manipulation. There would be no environmental limitations for temperatures, chemicals or dust.

*Id.* at 438.

On May 12, 2015, after the examination by Dr. McMillan, Jain had a CT scan of his abdomen done, on a referral by Dr. Bhateja (as noted above). *Id.* at 439-440. The impression from that procedure was as follows:

> 1. LARGE FLUID FILLED DISTAL ESOPHAGUS MEASURING 3.72 CM IN AP DIMENSIONS BY 5.67 CM TRANSVERSELEY.

---

[7] The Administrative record contains no further medical records from the Alameda County Medical Center.

2.   THE DIFFERENTIAL DIAGNOSIS WOULD INCLUDE ACHALASIA, DISTAL ESOPHAGEAL STRICTURE OR MALIGNANCY

3.   UPPER ENDOSCOPY FOR FURTHER EVALUATION

*Id*. at 439.

At an appointment with Dr. Bhateja on July 28, 2015, the Plan Orders entry states that Jain "needs poem surgery soon as recommended by gi."[8] *Id*. at 459.

In August 2015, Jain sought medical care in connection with his achalasia in Jodhpur, India, at the Manas Gastro Center and at the Mahatma Ghandi Hospital. *Id*. at 466-467.  Although the medical records from that treatment are minimal, a note from the Gastroenterology Services department of the Mahatma Ghandi Hospital states: "[t]he esophagus is dilated with food residue. Procedure terminated." *Id*. at 467.

On November 24, 2015, Jain underwent poem surgery at Stanford Hospital, performed by Dr. Homero Rivas. *Id*. at 472.  He was discharged on November 25, 2015. *Id*. at 479. Although he was scheduled for a post-operative visit with Dr. Rivas on December 11, 2015, *id*. at 478, there is no report from that visit in the Administrative Record.

Jain was seen by Dr. Bhateja on January 6, 2016. *Id*. at 480-482. With respect to his achalasia, the note states only, "counseling include(s) avoid spices and NSAID pain meds." *Id*. at 480.  There is no express reference to the poem surgery or whether it was successful.  On the Problem List, esophagitis continued to be listed as chronic. *Id*. at 483.

**D.   Jain's Exertion Questionnaire**

On December 17, 2014, Jain completed an Exertion Questionnaire ("Questionnaire").  In the Questionnaire, Jain states that his achalasia causes him to have difficulty swallowing, regurgitation of food and reflux, a burning sensation in his sternum and dysphagia. *Id*. at 232. He states that his main activity each day is eating his lunch and dinner, which takes him three to four hours because he has difficulty swallowing and food gets stuck in his "food pipe" requiring him to

---

[8] According to Stanford Health Care's website, "poem" stands for Peroral Endoscopic Myotomy and involves placing small cuts (myotomy) at the base of the esophagus to relax stiff muscles, relieve narrowing and allow food and liquids to pass into the stomach with ease. *See* https://stanfordhealthcare.org/medical-treatments/p/peroral-endoscopic-myotomy-poem.html.

vomit to get the food out. *Id*. He states that he can walk up to half a mile but he "feel[s] [a] burning sensation in [his] esophagus and if [he does] not get [a] water bottle . . ." *Id*. He states that climbing stairs causes his esophagus to burn. *Id*. at 233.

Jain states that his wife does most of the chores. *Id*. He states that he can drive three to five miles but if he drives longer he needs water or coke for esophagus pain and when that does not help, he must pull over and rest in the car. *Id*. Jain states that when he tries to do yard work he experiences "great discomfort and burning" of his esophagus that results in vomiting and dizziness. *Id*. Jain states that he used to be able to "do all these chores so easily" but that now he feels "so physically uncomfortable with burning sensation, vomiting, dizziness, etc." *Id*. He states that he has insomnia because he is always hungry at night and that he is fatigued during the day and takes two to three naps a day of between 40 and 50 minutes. *Id*.

**E.    The Hearing**

ALJ John Flanagan conducted a hearing on February 10, 2016. He began by advising Jain that he would continue the hearing to allow Jain to obtain counsel to represent him at the hearing but that if Jain chose to proceed without counsel, the ALJ would give the same weight to the evidence and allow Jain to tell the ALJ "whatever [he] want[ed] to." *Id*. at 34-38. Jain told the ALJ that he had already attempted to obtain counsel without success and that he wished to proceed without counsel to avoid further delay. *Id*.

The ALJ then took testimony about Jain's age and education, as well as his height and weight. *Id*. at 43. With respect to his weight, Jain testified that three months ago his weight had dropped to 138 pounds and that he hadn't been "able to eat or drink anything in August and September." *Id*. at 44. Jain testified that during that time, he was unable to move forward in treating his achalasia because he was waiting for insurance clearance for his poem surgery, so he went to India to get advice from doctors there. *Id*. at 54. He testified that within three days of his arrival in India he was unable to eat or drink anything and that due to the heat there his esophagus "shrunk complete[ly.]" *Id*. at 54-55. According to Jain, he feel[s] either too hot or too cold" because of his disease, and must remove even his undershirt to eat when it is warm; in the winter he must wear many sweaters and jackets. *Id*. Jain testified that he was put on a glucose drip "for

almost two months" while in India because he could not eat or drink anything. *Id*. at 53. Jain further testified that he saw many doctors in India and they recommended immediate surgery but that he that he wanted to return to the United States for the surgery.[9] *Id*. at 55.

According to Jain, when he returned he had difficulty obtaining approval for the poem surgery but ultimately it was approved. *Id*. at 55. The ALJ asked Jain if the poem surgery helped and Jain responded that it "helped [him]" to the extent that he could "eat something [a] little bit." *Id*. at 54; *see also id*. at 56 (confirming that poem surgery "only helped a little bit."). Jain testified that after his surgery he was able to gain some weight, bringing it up to 167.8 at his January 6, 2016 visit to Dr. Bhateja. *Id*. at 44.

Jain testified that he lost his job in 2010 and that he subsequently formed his own company, Mindpower. *Id*. at 44-45. He described the physical demands of that work, which he performed from his home, testifying that he worked "mostly sitting or lying down" and at stated that his hours varied because he often had difficulty sleeping and sometimes got up and worked at 3 am. *Id*. at 46. His work with Mindpower involved lifting no more weight than his laptop (10-12 pounds), but Jain testified that he felt "so much tiredness so many times." *Id*. at 47. Jain also described the demands of his job with Infobizz between 2002 and 2010. *Id*. at 47-49. This included sitting 60-70% of the time and walking or meeting clients 30-40% of the time. *Id*. at 48. It involved carrying up to 20 pounds. *Id*. at 49. Jain testified that in the months of April through June 2014 he was struggling with his health and could no longer work, earning only about $1,000 in each of those months. *Id*. at 49-51.

When the ALJ asked Jain why he cannot work, Jain testified that it takes him three to four hours to eat and that his food gets stuck, requiring him to vomit; that he is unable to eat properly during the day and wakes up hungry in the middle of the night, requiring him to start the process over again, and that he hardly sleeps. *Id*. at 52; *see also id*. at 55 (testifying that he spends "all day" struggling to feed himself and often sleeps two-to three hours in the afternoon or evening because of his difficulty sleeping at night). He testified that he has chest pain all the time. *Id*. He

---

[9] Jain also described his medical difficulties while in India in a Disability Report he filed with the agency on October 9, 2015. AR at 250-261.

9

testified that in January 2016 his doctor replaced his Nexium prescription with pantoprazole because Jain's insurance refused to pay for the Nexium. *Id*. at 53. He also takes sucralfate before meals. *Id*. When the ALJ asked if the medications helped Jain testified, "They help otherwise I cannot even probably eat anything at all." *Id*.

Jain testified that his wife does all of the household chores. *Id*. at 57. He testified that he would like to work and would be able to perform his job if he were allowed to do it over a 24 hour period rather than in the course of an eight-hour day if the job could accommodate his needs due to his disease. *Id*. at 57-58. He testified that he can sit only 15-20 minutes before he needs to change position and that even if he is able to change position he may not be able to sit more than four hours at a time. *Id*. He testified that his ability to stand and walk is similarly "variable." *Id*. He testified that he drives his children to and from school, which is one mile from his home. *Id*. at 60. According to Jain, other than his trip to India he has not travelled anywhere since 2014. *Id*. at 61. Jain testified that during the day he must lie down because of reflux, and lies down anywhere from twenty minutes to four hours at a time. *Id*. In addition, in August and September there were days when Jain couldn't get out of bed, and in December 2015, Jain also was in bed for almost three weeks. *Id*. at 62.

With regard to pain, Jain testified that he has to "keep so much water" because if he does not have water he feels like "somebody has . . . used a matchstick on my . . . esophagus" and he will collapse. *Id*. at 63. He testified further that "now even water doesn't help [him]" and that he needs to eat "so much ice cream to relax his esophagus when it starts burning." *Id*.

Next, the ALJ took testimony from VE Linda Tolley. *Id*. at 64. Ms. Tolley testified that Jain's past work at Infobizz (2002-2010) would be classified as a "software specialist, DOT code 030.162-010, skill level 7, sedentary but performed at the light level because of the standing and walking 30 to 40 percent of the day." *Id*. at 67. She testified that his work with Mindpower would be classified as a consultant, DOT code 189.117-050, skill level 8, sedentary, with lifting up to 50 pounds as performed. *Id*.

The ALJ asked the VE to address the following hypothetical:

> For the first hypothetical, I want you to assume . . . that we have an

> individual who is 42 years of age, has an MBA, and . . . additional experience or education beyond his MBA. . . . If [that individual is] just restricted physically to sedentary, light, or medium exertion as defined in the regulations . . . would such a person be able to do the past work?

*Id*. at 67. The VE responded that such a person would be able to do the past work described above. *Id*. Next, the ALJ modified the hypothetical to add a requirement that the individual needed "unscheduled rest breaks during the day and these rest breaks could actually last for several hours at a time." *Id*. at 67-68. The VE testified that this additional limitation would preclude all work. *Id*. at 68. Finally, the ALJ asked the VE to opine as to "how many days a month an individual could miss and still maintain competitive employment." *Id*. The VE testified that although there may be more leeway for skilled positions than unskilled positions, a skilled individual who misses one day per month due to illness may be subject to disciplinary action "if it's every month." *Id*. She opined that approximately 50% of employers would allow up to one sick day a month whereas 50% would not; she explained that this estimate was based, in part, on the fact that some companies have flex time, "especially for software-type positions." *Id*. at 69.

After the ALJ questioned the VE, he asked Jain if he had any questions for the VE. Jain said that he heard only half of what the VE said and the ALJ explained that the VE had reviewed the information provided by Jain regarding his past employment, classified his past work within the context of the Dictionary of Occupational Titles and then "responded to questions that [the ALJ] asked based on various evidence in the record." *Id*. at 69-71. Jain did not ask any questions of the VE.

### F.    The Commissioner's Five-Step Framework for Disability Determinations

The Commissioner has established a sequential five-part evaluation process to determine whether a claimant is disabled under the Social Security Act. 20 C.F.R. § 404.1520(a). At Step One, the Commissioner considers whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). If he is, the Commissioner finds that the claimant is not disabled, and the evaluation stops.

If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two and considers whether the claimant has "a severe medically determinable physical or

11

mental impairment," or combination of such impairments, which meets the duration requirement in 20 C.F.R. § 404.1509. An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, disability benefits are denied at this step.

If it is determined that one or more impairments are severe, the Commissioner will next perform Step Three of the analysis, comparing the medical severity of the claimant's impairments to a compiled listing of impairments that the Commissioner has found to be disabling. 20 C.F.R. § 404.1520(a)(4)(iii). If one or a combination of such impairments, which meets the duration requirement in 20 C.F.R. § 404.1509. An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, disability benefits are denied at this step.

If it is determined that one or more impairments are severe, the Commissioner will next perform Step Three of the analysis, comparing the medical severity of the claimant's impairments to a compiled listing of impairments that the Commissioner has found to be disabling. 20 C.F.R. § 404.1520(a)(4)(iii). If one or a combination of the claimant's impairments meet or equal a listed impairment, the claimant is found to be disabled. Otherwise, the Commissioner proceeds to Step Four and considers the claimant's residual functional capacity ("RFC") in light of his impairments and whether he can perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv); 20 C.F.R. § 404.1560(b). If the claimant can still perform past relevant work, he is found not to be disabled.

If the claimant cannot perform past relevant work, the Commissioner proceeds to the fifth and final step of the analysis. 20 C.F.R. § 404.1520(a)(4)(v). At Step Five, the burden shifts to the Commissioner to show that the claimant, in light of her impairments, age, education, and work experience, can perform other jobs in the national economy. *Johnson v. Chater*, 108 F.3d 178, 180 (9th Cir. 1997). A claimant who is able to perform other jobs that are available in significant numbers in the national economy is not considered disabled, and will not receive disability benefits. 20 C.F.R. § 404.1520(f). Conversely, where there are no jobs available in significant numbers in the national economy that the claimant can perform, the claimant is found to be disabled. *Id.*

In the ALJ's decision, he made the following findings under the five-step framework discussed above.

At Step One, the ALJ found that Jain had not engaged in "substantial gainful activity" since May 1, 2014.  *Id*. at 20.  At Step Two, the ALJ found that Jain has the following severe impairment:  "[m]edical history of pan-esophageal achalasia, Type 2, status post Heller myotomy (2007), with incompetent lower esophageal sphincter."  At this step, the ALJ found that this impairment "significantly limits the claimant's ability to perform basic work activities" but that "[t]he record as a whole confirms there are no exertional, mental or environmental limitations." *Id*. at 21.  The ALJ found that Jain "does have severe limitations related to his ability to eat and the vomiting thereafter."  *Id*.  The ALJ gave "little weight" to the opinions of two non-examining agency doctors, Drs. Williams and Trias, who concluded based on their review of the records that Jain's impairment was non-severe.  *Id*. (citing Exhibits 1A at p. 6 (AR at 78) and 3A at p. 7 (AR at 88)).

At Step Three, the ALJ concluded that Jain did not have an impairment that meets or medically equals the severity of one of the listed impairments of 20 CFR Part 404, Subpart P, Appendix 1.  *Id*.  The ALJ stated that in making this determination, he considered all of the listed impairments, including those listed in section 5.00, relating to the digestive system.  *Id*.

At Step Four, the ALJ found that Jain has "the residual functional capacity to perform a full range of work at all exertional levels."  *Id*.  He further found that "[t]here are no physical, mental or environmental limitations" but that Jain is "restricted and severe in the sense of having to schedule sufficient time to eat and what he eats in light of his esophageal disorder and associated symptoms of vomiting."  *Id*.

The ALJ's RFC was based on a two-step analysis.  *Id*.  First, the ALJ found that Jain had an underlying medically determinable physical impairment that could reasonably be expected to produce Jain's symptoms.  *Id*. at 21-22.  Next, he addressed the "intensity, persistence, and limiting effects" of Jain's symptoms to determine the extent to which they limit his functioning. *Id*. at 22.  The ALJ stated that in performing this analysis, "whenever statements about the

intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, [he] must make a finding on the credibility of the statements based on a consideration of the entire case record." *Id.* The ALJ concluded that Jain's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible. *Id.*

The ALJ discounted Jain's testimony regarding the severity of his symptoms on several grounds. First, the ALJ notes that Jain's only impairment is his achalasia and emphasizes that Jain has no strength or mental limitations, no environmental limitations "such as working with exposure to heat, cold, dryness, wetness, working at heights, climbing, working around dangerous equipment, or large bodies of water." *Id.* at 24. The ALJ points out that Jain drops his children off at school and picks them up. *Id.* In short, the ALJ concludes, "the *only* limitation appearing in the record is that claimant alleges that it takes him several hours to eat and he often vomits thereafter." *Id.* (emphasis added).

Next, the ALJ cites to a note from Jain's May 3, 2013 visit to Dr. Bhateja stating that Jain was negative for lethargy, weight gain and weight loss. *Id.* (citing AR at 338, 370). Along these lines, the ALJ points out that the weight recorded at Jain's visits to Dr. Bhateja and the visit to Dr. McMillan reflected a differential of only eight pounds over the previous two years, which he did not find to be significant. *Id.* He also cited to the absence of any evidence in the medical records that Jain experienced dehydration. *Id.* Instead, the ALJ found that the treatment recommended by Jain's doctors to ameliorate his symptoms – "avoid[ing] certain foods, eat[ing] smaller meals . . . and wait[ing] 2 to 3 hours [after a meal] before lying down" – "appears to be successful to a significant degree as the claimant has been able to maintain close to his normal weight over the years." *Id.* In support of this conclusion, the ALJ points to Dr. McMillan's reference to needing to stand while eating, even at restaurants, concluding on the basis of this statement that Jain is "able to eat out at restaurants." *Id.* The ALJ further opined, "the limitations in this record relate directly to actions which are within [Jain's] control in terms of eating the types of food that he is able to eat, and helping to control his symptoms by determining how much and when he eats." *Id.*

The ALJ also found that Jain's symptoms were not as severe as Jain described on the basis

14

that his impairment "has been going on for years all the way back to 2007 when he had the Heller myotomy surgery on his esophagus" and yet "he worked thereafter from 2008 through 2014, a period of six years with essentially the same impairment and symptomatology that he has currently." *Id*. (citing Jain's earning records). According to the ALJ, "[t]he claimant's current records . . . do not demonstrate any worsening of his esophageal disorder and indicates that it appears to be stable." *Id*. at 24-25.

The ALJ also found that "the level of [Jain's] complaints at the hearing are not supported by the degree alleged by his underlying treatment records" because "his own doctors do not describe [his esophageal disorder] to the degree that it completely disrupts his daily behavior and impairs his sleeping at night." *Id*. at 25. Rather, the ALJ opined, Jain's "own doctors describe symptomatic care eating pureed foods and liquids and engaging in lifestyle changes." *Id*. According to the ALJ, Jain "admits in the record that he can control his symptoms to a considerable degree by controlling when he eats." *Id*. (citing AR at 435, describing Jain's statements to Dr. McMillan about his difficulties associated with eating, which include the statement that "he often has to modify the times he eats.").

Finally, the ALJ noted that at the hearing, Jain "had the demeanor of a healthy young man who had no difficulty sitting, standing, walking or testifying that could be observed by a layperson." *Id*.

Based on the RFC described above, the ALJ concluded that Jain could perform his past relevant work as a consultant and as a software specialist, both as those jobs are generally performed and as they were actually performed by Jain. *Id*. at 25. On that basis, the ALJ concluded that Jain had not been disabled from May 1, 2014 through the date of the ALJ's decision.

### H.    Contentions of the Parties

Jain challenges the ALJ's conclusions on numerous grounds. First, he argues that the ALJ mischaracterized the medical records to the extent that he found that Jain's doctor's found Jain's symptoms to be less severe than Jain described and within Jain's control. Plaintiff's Motion at 8-11. According to Jain, the records from his doctors do not confirm that Jain's symptoms are

within his control; instead, he argues, his doctor's notes are consistent with his testimony regarding the severity of his symptoms and these doctors' opinions should have been given controlling weight. Likewise, Jain contends that the medical records do not provide substantial evidence to support the ALJ's conclusions about Jain's limitations and the credibility of Jain's testimony on that subject. *Id.* at 11-14.

Jain also argues that the ALJ did not give proper weight to his testimony. *Id.* at 14-19. He contends the ALJ's reliance on his relatively stable weight, as reflected in the medical records, did not take into account Jain's testimony that just a few months before the hearing his weight had dropped to 138 pounds. *Id.* at 15. He further questions the ALJ's statement that Jain appeared healthy at the hearing, stating that he was experiencing discomfort and pain during the hearing and that he "kept himself hungry" so that he could focus on the testimony. *Id.* at 16. As to the ALJ's statement that Jain is able to eat at restaurants, Jain contends the ALJ distorted Dr. McMillan's description of Jain's symptoms, which described Jain's "severe burning in esophagus, dilated esophagus, severe vomiting, first surgery at Kaiser in 2007 and loss of 50 pounds prior to surgery and continuous vomiting problems even after first surgery" and Jain's need to "stand [at] all times while eating at home or if he ever had to go to a restaurant." *Id.* at 17. In other words, Jain explains, his statement to Dr. McMillan that he had to stand even if he went to a restaurant was intended to "convey his extreme discomfort and struggle at every moment of life" and does not provide a basis for discounting Jain's testimony about the limitations associated with his disease. *Id.*

Jain also argues that the ALJ's RFC is not supported by substantial evidence. *Id.* at 19-23. Among other things, he disputes the ALJ's conclusion that Jain has no environmental limitations, pointing to his own testimony at the hearing regarding his difficulty with heat and cold. *Id.* at 21. In particular, he cites his testimony that when he went to India, his condition got dramatically worse due to the heat there. *Id.* In addition, Jain contends the ALJ's reliance on his ability to work through 2014 overlooks the fact that he lost his job in 2010 "because of his health situation" and was unable to get anyone to hire him; Jain further points out that even when he formed his own company in 2013 so that he could work remotely from home and get some flexibility, he

16

could not finish his clients' work and by the summer of 2014 was unable to work at all. *Id*. at 22.

Finally, Jain argues that the ALJ failed to properly develop the record because he did not seek the opinion of his treating physician, Dr. Bhateja, or the surgeons who performed his poem surgery, instead relying only on his doctors' recommendations that he make "lifestyle changes" related to what and when he eats. *Id*. at 23-24.

Jain asks the Court to reverse the decision of the Commissioner and remand for award of benefits. *Id*. at 24. In the alternative, he asks the Court to remand for further proceedings. *Id*. at 25.

The Commissioner contends the ALJ's decision is supported by substantial evidence and that he properly evaluated the medical record and Jain's testimony.

## III.    ANALYSIS

### A.    General Legal Standards Under 42 U.S.C. § 405(g)

When asked to review the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and supported by "substantial evidence." 42 U.S.C. § 405(g).   Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be based on the record as a whole. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial evidence means "more than a mere scintilla," *id*., but "less than a preponderance." *Desrosiers v. Sec'y of Health & Hum. Servs*., 846 F.2d 573, 576 (9th Cir. 1988).  Even if the Commissioner's findings are supported by substantial evidence, they should be set aside if proper legal standards were not applied when weighing the evidence and in reaching a decision. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).

In reviewing the record, the Court must consider both the evidence that supports and detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).   "Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  Courts "are constrained to review the reasons the ALJ asserts" and "cannot rely on independent findings" to affirm the ALJ's decision. *Connett v. Barnhart*, 340 F.3d 871, 874 (citing *SEC v. Chenery Corp.*, 332 U.S. 194,

196 (1947)).

If the Court identifies defects in the administrative proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits. *Garrison v. Colvin*, 759 F.3d 995, 1019-1021 (9th Cir. 2014).

### B. Whether the ALJ Gave Clear and Convincing Reasons for Declining to Fully Credit Jain's Statements Relating to the Intensity, Persistence and Limiting Effects of his Symptoms[10]

#### 1. Legal Standards for Evaluation of Claimant's Testimony

"[T]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). "The ALJ's findings, however, must be supported by specific, cogent reasons." *Id.* "In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Ligenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal quotation marks and citation omitted); *see also Molina*, 674 F.3d at

---

[10] In the Commissioner's summary judgment motion, she offers a number of grounds in support the ALJ's credibility finding that were not cited by the ALJ. For example, the Commissioner argues that Jain's "repeated statements that he could work" if given sufficient flexibility "alone constitute substantial evidence to deny his claim for benefits." Defendant's Motion at 15. In a similar vein, the Commissioner quotes statements by Jain that he "love[s] to make money", *id.* (citing AR at 69) and that an agency representative identified as "B. Bruzas" found Jain to be "[v]ery conceited, annoying" and related that Jain "[a]nnounced that he is disabled but needs to be hired to earn $5,000/mo," implying that Jain's desire to work and earn money – and apparently an agency employee's opinion about Jain's personality – are proper grounds to discount Jain's testimony. *Id.* at 5 (citing AR at 208). To the extent these reasons were not offered by the ALJ, the Court need not consider them here. The Court further finds these arguments unconvincing. The Ninth Circuit has "recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). The fact that Jain expressed a desire to work and earn money is not substantial evidence that Jain is not disabled, contrary to the Commissioner's assertion. Nor do the opinions of an agency representative that Jain is "conceited" and "annoying" have any place in this analysis. It is troubling that an agency representative considered this ad hominem attack on Jain's personality to be relevant to the disability determination. It is even more troubling that counsel for the Commissioner chose to highlight this inappropriate comment in the Commissioner's summary judgment motion.

1112. "Second, if the claimant meets this first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of [the claimant's] symptoms only by offering specific, clear and convincing reasons for doing so." *Ligenfelter*, 504 F.3d at 1036 (internal quotation marks and citation omitted); *see also Molina*, 674 F.3d at 112.

Social Security Ruling 88-13 describes the inquiry at the second step "[w]hen the claimant indicates that pain is a significant factor of his/her alleged inability to work, and the allegation is not supported by objective medical evidence in the file." SSR 88-13. Under those circumstances, the adjudicator must "obtain detailed descriptions of daily activities by directing specific inquiries about the pain and its effects to the claimant, his/her physicians from whom medical evidence is being requested, and other third parties who would be likely to have such knowledge." SSR 88-13 further explains:

> In developing evidence of pain or other symptoms, it is essential to investigate all avenues presented that relate to subjective complaints, including the claimant's prior work record and information and observations by treating and examining physicians and third parties, regarding such matters as:
>
> 1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
>
> 2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
>
> 3. Type, dosage, effectiveness, and adverse side-effects of any pain medication;
>
> 4. Treatment, other than medication, for relief of pain;
>
> 5. Functional restrictions; and
>
> 6. The claimant's daily activities.

*Id*.

### 2. The ALJ's Credibility Findings

The ALJ concluded that Jain's *only* limitation is that it takes him several hours to eat and he often vomits thereafter. He further found that Jain can control these symptoms to a "considerable degree" by controlling when he eats and making lifestyle changes such as eating pureed food. In reaching these conclusions, the ALJ discounted Jain's testimony about many of

the symptoms associated with his achalasia, including the frequent burning pain he said he experiences.[11]  The ALJ was required to offer clear and convincing reasons for failing to credit Jain's testimony.  The Court concludes that he failed to meet that standard.

a.      Reliance on the Medical Records

The ALJ relies on the medical records to support his conclusion that Jain's limitations are not as severe as Jain testified. The ALJ's reasoning is flawed in a number of respects.

First, the ALJ concluded that Jain's condition and symptomatology appear to be "stable," AR at 24-25.  On this basis, he found that Jain worked for a period of six years ("from 2008 through 2014") with essentially the same impairment, undermining Jain's testimony that he is unable to work.  Aside from the factual error as to duration of Jain's employment while suffering from achalasia – the earnings records before the ALJ showed that Jain had *no* earnings in 2011 and 2012 and that he worked only the first quarter of 2014 – the ALJ's conclusion is unsupported by any medical evidence relating to Jain's impairment between 2008 and 2013 as Jain did not provide, and the ALJ did not request, any medical records for that period.  Moreover, Jain offered testimony that he was unable to find employment after he lost his job in 2010 because of his health problems and that beginning in April 2014 he was unable to work even when he was self-employed due to his health problems.  The ALJ does not explain why he apparently discounted this testimony.

Second, the ALJ appears to have relied on Jain's weight as a proxy for Jain's limitations. Citing the relatively stable weight reflected in the notes of Dr. Bhateja, the ALJ concludes that the "lifestyle changes" recommended by Jain's doctors have been successful.  He does not explain, however, why Jain's ability to maintain his weight is inconsistent with Jain's testimony about limitations such as the burning in his chest that requires him to lie down throughout the day, or Jain's testimony that exposure to heat and cold exacerbate his symptoms (both of which were omitted from Jain's RFC).

Nor does the ALJ offer any explanation for his apparent rejection of Jain's testimony that

---

[11] The ALJ did not make a finding that Jain was a malingerer. Nor does the Commissioner argue that Jain is a malingerer in her summary judgment motion.

his symptoms dramatically worsened while in India, resulting in his weight dropping to 138 pounds. While the medical records Jain provided as to this period were scant, the ALJ did not request additional records and did not offer any reasons for ignoring Jain's testimony about this period, much less clear and convincing reasons. Likewise, he offered no explanation for his apparent rejection of Jain's testimony that he was in bed for three weeks in December of 2015. In short, Jain's testimony about his impairment in the months leading up to the hearing were in direct conflict with the ALJ's conclusion that his condition was stable, yet the ALJ offered no reasons for rejecting that testimony.

Third, the ALJ found that Jain's doctors did not describe Jain's impairment to the "degree that it completely disrupts his daily behavior and impairs his sleeping at night." AR at 25. In support of this conclusion, he points to his doctors' recommendations that Jain eat pureed foods and liquids and engage in lifestyle changes. *Id*. Given that Jain's doctors told him there was no cure for achalasia, the fact that they recommended that he eat pureed food and make other lifestyle changes to control his symptoms is not a clear and convincing reason for rejecting Jain's testimony about his symptoms. Furthermore, the medical records reflect that Jain's doctors did not simply recommend "lifestyle changes" but also referred him for numerous tests and procedures and ultimately for poem surgery.

Therefore, the Court concludes the ALJ's reliance on the medical records was not a clear and convincing reason for rejecting Jain's testimony about his limitations.

b.      Jain's Testimony About His Symptoms and Daily Activities

The ALJ also cited statements by Jain about his symptoms and daily activities in support of his finding that Jain was not completely credible. In particular, he relied on Jain's ability to go to restaurants and drive his children to school, and on a purported admission by Jain that he can control his symptoms to a considerable degree, in support of his credibility finding. These reasons do not meet the clear and convincing standard.

First, Jain's statement to Dr. McMillan that even when he goes to restaurants he has to stand does not constitute clear and convincing evidence that his symptoms are not as severe as Jain contends. This statement was offered to illustrate Jain's difficulty eating but otherwise sheds

almost no light on Jain's condition.  *See Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir.1987)(noting that a disability claimant need not "vegetate in a dark room" in order to be deemed eligible for benefits).  Likewise, his testimony that he drives his children to school – a distance of only a mile in each direction – is not inconsistent with his testimony that he often experiences burning pain and needs to lie down, that he has difficulty sleeping, and that he is sensitive to heat and cold.  Indeed, he stated in his Questionnaire that when he drives more than a few miles he sometimes experiences burning pain and that when water or coke does not alleviate the pain he has to pull over and rest.

Second, the ALJ's finding that Jain has admitted that he can control his symptoms "to a considerable degree" mischaracterizes the record.  The ALJ apparently relies on a statement made by Jain to Dr. McMillan that he "often has to modify the times he eats."  AR at 25 (citing AR at 435).  There is nothing in Dr. McMillan's description of what Jain reported to him, however, that suggests Jain told him that he can control his symptoms "to a considerable degree" by adjusting the times when he eats.  To the contrary, Dr. McMillan recounts at length Jain's difficulties with eating and his "burning pain" and notes that even at the appointment, Jain was still vomiting.  AR at 435.  Jain's statement that he has to modify the times he eats is not a clear and convincing reason for the ALJ's conclusion that by doing so Jain is able to control his symptoms.

### C.     Whether the ALJ Adequately Developed the Record

"'In social security cases, the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)).  This duty is heightened when a claimant is not represented by counsel, in which case the ALJ must "'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" *Cox v. Califano*, 587 F.2d 988, 991 (9th Cir.1978) (quoting *Gold v. Sec'y of Health, Educ. & Welfare*, 463 F.2d 38, 43 (2d Cir.1972)).  The ALJ did not fulfill this duty here.

Jain testified that his limitations are severe, that he had had at least two serious episodes in the months leading up to the hearing that kept him in bed for days or weeks and, in one case (during his trip to India) prevented him from eating or drinking anything.  He testified that his

condition is exacerbated by heat and cold, that he has severe burning that requires him to lie down up to four hours at a time. The medical records, while not necessarily inconsistent with Jain's description of his symptoms, simply do not address the severity of these limitations. Given that Jain was seen on a regular basis by Dr. Bhateja, the ALJ had a duty to obtain her opinion as to Jain's limitations before concluding that Jain's testimony was exaggerated. Among the specific limitations that Dr. Bhateja could have opined upon are Jain's need to lie down during the day, the number of days in each month Jain is typically bedridden, the degree to which physical activity exacerbates his symptoms, and whether Jain has any environmental limitations relating to heat and cold. The ALJ should also have sought the opinions of either Dr. Bhateja or Jain's surgeons (or both) as to whether Jain's poem surgery was successful and the degree to which they expected the surgery to alleviate Jain's symptoms.

### D. Appropriate Remedy

If an ALJ has improperly failed to credit claimant testimony or medical opinion evidence, a district court must credit that testimony as true and remand for an award of benefits if three conditions are satisfied:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014). Under such circumstances, a court should not remand for further administrative proceedings to reassess credibility. *See id.* 1019-21. This "credit-as-true" rule, which is "settled" in the Ninth Circuit, *id.* at 999, is intended to encourage careful analysis by ALJs, avoid duplicative hearings and burden, and reduce delay and uncertainty facing claimants, many of whom "suffer from painful and debilitating conditions, as well as severe economic hardship." *Id.* at 1019 (quoting *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1398-99 (9th Cir. 1988)).

Here, Jain's testimony that he had to lie down anywhere from twenty minutes to four hours at a time because of chest pain must be credited as true because the ALJ failed to provide

any reasons (much less clear and convincing reasons) for failing to credit this testimony. Given that the VE testified that such a limitation would preclude all work, the ALJ would be required to find Jain disabled, at least up to the time of his poem surgery, if the Court were to remand. Therefore, the Court concludes that for the period up to Jain's poem surgery, remand for award of benefits is appropriate.

On the other hand, the Court concludes that the record is not sufficiently developed as to Jain's limitations after his poem surgery to determine whether he continued to be disabled. Although Jain testified generally that he needed to lie down periodically due to chest pain, he also testified that the poem surgery helped "a little bit." The ALJ did not ask Jain to address what this meant with respect to specific limitations. Nor is there medical evidence in the record that sheds light on whether the poem surgery reduced Jain's chest pain and other symptoms. Therefore, further proceedings are warranted as to Jain's limitations following his poem surgery. In conducting these proceedings, the Commissioner should develop the record by at least obtaining the opinions of Jain's treating physicians regarding the impact of his achalasia on his ability to work an eight-hour day, the number of days a month he is likely to be bedridden, the amount of time each day Jain can sit or stand versus the time he must spend lying down, the impact of physical activity with respect to esophagus pain, and any environmental limitations.

## IV. CONCLUSION

For the reasons stated above, the Court GRANTS Jain's Motion for Summary Judgment and DENIES the Commissioner's Motion for Summary Judgment. The Court reverses the decision of the Commissioner and remands for award of benefits for the period May 1, 2014 to November 25, 2015. The Court remands for further proceedings to determine whether Jain continued to be disabled after November 25, 2015.

**IT IS SO ORDERED.**

Dated: January 2, 2018

JOSEPH C. SPERO
Chief Magistrate Judge